## VIRGINIE HERMANN *v.* THE NEW ORLEANS AND CARROLLTON RAILROAD COMPANY.

- Decision in *Hubgh* v. *The New Orleans and Carrollton Railroad Company*, 6 An., 495, affirmed. The Statute of March 1st, 1855, (Acts of 1855, p. 271,) having been passed since the act complained of, can have no effect on this case.

The assessment of damages to the wife and children from the homicide of the husband and father, can only be the balancing of probabilities and chances.

| 11 | 5 |
|----|-----|
| 50 | 60 |
| 50 | 478 |
| 50 | 479 |
| 11 | 5 |
| 110 | 720 |
| 11 | 5 |
| 119 | 63 |

APPEAL from the Fourth District Court of New Orleans, *Reynolds* J. *Ogden & Leovy* and *Legardeur*, for plaintiff. *Benjamin, Bradford & Finney* and *Eustis*, for defendant.

*R. N. Ogden*, for plaintiff: *

Chief Justice EUSTIS, in *Hubgh* v. the same defendants, 6th An., says :—

"But the ground on which Grotius, with whom the idea originates, places it, excludes all idea of its forming a part of the civil law, or being the basis of an action. Speaking of the indemnity to be made in cases of injury, he goes on to state some examples, of what the indemnity, which the party committing the wrong is bound to make, consists : A man who has unjustly killed another, ought to pay the expenses incurred for his physicians, and give to those whom the deceased was bound to support, as his father and mother, his women and his children, the amount of their maintenance, according to the age of the deceased. Thus Hercules, having slain Iphytus, paid a fine to his children, in order to secure more easily an expiation of his crime. A commentator of Aristotle says, that one gives to the wife, the children, and other dependents of the person slain, is given in some sort. When I speak of homicide, I mean an unjust homicide, that is, one committed by a person who had no right to do the act from which the death has ensued. If one has the right to endanger the life of another, however one may have sinned against charity, as in case of not taking to flight, he is not responsible for the death, so far as relates to the indemnity of which we are now treating. Besides, a price may be put upon the

(*) A large portion of the argument for plaintiff is a reprint of the argument for the re-hearing in *Hubgh's* case, 6th An., and is therefore omitted.

HERMANN
*v.*
CARROLLTON R.R.

life of a slave, who can be sold, but the life of a free person is not susceptible of valuation. The author refers in a note to the title in lib. 9 of the Digest, which is the title *De his qui Effunderint*," which, in case of a free man's having been injured by an object thrown into the street, provides, cicatricem, cautem aut deformitatis nulla sit estimatio, quia liberum corpus nullum recipit ostinatiosum, etc. "There is no estimate made of the scars, or deformity produced, because the value of the body of a free man cannot be estimated in money." This author did not profess to treat of "Jurisprudence, but he declared the principles of natural law, and the laws of nations, from the writings of the philosophers, poets, historians and orators of antiquity. He does not confound one with the other, and distinguishes both from the civil or municipal law. He, it will be observed, is obliged to consider this indemnity rather as a matter of gift or liberality; an affair of conscience, rather than an obligation of strict duty. Rutherford, in his Institutes of Natural Law, dissents from the opinion of Grotius, in his discrimination between the valuation of the life of a free man and of a slave, and thinks that in case of the slaying of either, his life can be estimated according to the interest which those who survive have in it." Book 1, Ch. 17, § 9.

We have fairly transcribed the whole passage, in order to do the opinion full justice, and also that our comments upon it may be more easily understood.

If this be a correct statement of the views of Grotius, it is certainly fatal to the plaintiff's case. No more respectable authority could be cited, nor one entitled to more weight in a court of justice. If indeed he "places it on a ground excluding all idea of its forming a part of the civil law, or being the basis of an action;" if indeed "he considers this indemnity rather as a matter of gift or liberality; an affair of conscience, rather than an obligation of strict duty," then it would seem unnecessary to enquire into the Roman law, of which his treatise is so full, and from which fountain of jurisprudence he drew so largely. But let the passage of which this quotation professes to be a translation, speak for itself. It is in the § 13th of chapter 17th, of the Rights of War and Peace.

Exemplo hæc sint. Homicida injustus, tenetur solvere impensas, si quæ factæ sunt in medicos, et iis quos occisus alere exofficio solebat, puta parentibus, uxoribus liberis dare tantum, quantum illa spes alimentorum, ratione habita ætatis occissi, valebat—sicuti Hercules legitur Iphiti a se occissi leberis mulctam pependissi, quo facilius expiaretur. Michael Ephesius ad quintum Nicomachiorum Aristotilis: Alla kai o Phoneuthies elabe tropon tina—O gare e gune e oi paides, e oi suggenies tou phoneuthentos elabe tropon tina ekeino dedotai. Sed et qui occisus est accipit aliquo modo. Quæ enim uxor ejus et liberi et cognati accipiunt, ipse quodammodo accipit. Loquimur de homicida injusto, id est, qui non habuit jus id faciendi unde mors sequitur. Quare si quis jus habuirit sed in caritatem peccavirit ut qui fugere noluit, non tenebitur.

Vitæ autem in libero homine æstimatio non fit, secus in servo qui vendi potuit.

The mistake in the translation will be readily perceived; and we are convinced would not have been committed, had the original been consulted: but, as the original is extremely rare, we must presume that the Judge was misled by some erroneous translation.

We submit the following, as a correct and literal translation of the passage. The following may be for example: A man slaying another, unjustly, is bound to discharge the expenses, if any are contracted, for physicians, and to give to those whom the slain was in duty accustomed to maintain—such as parents, wives, children—as much as that hope of maintenance—regard being had to the age of the deceased—was worth: thus, Hercules is said to have made reparation (paid a fine) to the children of Iphitus, slain by him, in order that expiation might more easily be made.

Michael, the Ephesian, says, upon the 5th of the Nicomachii of Aristotle: "but also the person slain receives, in some sort, for what the wife or children or relations of the person slain receive is, in some sort given him." We are speaking of an unjust man-slayer: that is, one who had not the right of doing that from whence death follows.

Wherefore, if any one may have had the right, but has sinned against charity, as when one (being assaulted) has been unwilling to flee, he shall not be bound. But of life, in case of a free man, no valuation is made, otherwise, in case of a slave who can be sold.

The quotation, from the commentator of Aristotle, is a glaring mistake. That <span style="float:right">HERMANN</span> was the only part of the passage, even as translated in the opinion, which <span style="float:right">CARROLLTON R R.</span> countenanced the idea that this indemnity is a mere gift or liberality. On this mistake alone, is founded the assumption that Grotius treats it as a gift or libe- rality ; and it means exactly the reverse—it was intended to enforce it more strongly as a duty. An offence, a wrong had been committed, which demand- ed expiation. This expiation could only be made by repairing, as far as possi- ble, the damage it had caused to those whom the deceased was bound to sup- port, and the idea is conveyed in this way : But also the person slain receives in some sense, because that which is given to his dependants is, in a certain sense, given to him. All the rest of the passage enforces it as a duty, by the strongest language, *tenetur solvere*—is bound to pay or discharge—*tenetur dare*, is bound to give—*mulctam pependisse*, to have paid the fine. These are applied to the case of unlawful killing. But the passage itself clearly draws the dis- tinction between such a case and one where the killing was justifiable, though contrary to the duty of charity, or a tender regard to the life of an enemy—as where the necessity might have been avoided by flight, but the party assailed, ·chose to stand on·his legal right of self-defence.

In the first case, he incurs the responsibility ; in the second, he incurs none, although he may have sinned against charity. Indeed there is a singular con- tradiction in the very terms employed to convey the meaning of Grotius. At the same time that he is represented as considering it as a mere matter of gift or liberality, it is said that: "Speaking of the indemnity to be made in cases of injury, he goes on to state some examples of what the indemnity, which the party committing the wrong is bound to make, consists." Now, on the one hand, no man is bound to give or to be liberal ; and on the other hand, no man who has inflicted an injury, or committed a wrong, can claim exemption from responsibility, and affect to be liberal.

Such a contradiction, in a writer so generally distinguished for fluency and precision, can only be ascribed to that confusion which is the constant hand- maid of error.

We must believe there is some ambiguity in the sentence in which the judge would seem to say, that the "*idea*" that indemnification is due in cases of homicide, originated with Grotius. It was familiar to the people of remote an- tiquity. Grotius flourished in the seventeenth century, and died in 1645. His great master piece, this treatise *de jure belli et pacis*, was therefore modern. In that treatise, and near the place from which the quotation is made, Grotius cites a treaty between the English and the Danes, in which it is stipulated that if an Englishman should kill a Norwegian, or a Norwegian an Englishman, each King bound himself, respectively, to take such measures as that the heirs of the deceased should obtain just satisfaction, and that he who had killed him ·should pay them the indemnity ; and this fine or indemnity is supposed to be the weregild of the ancient Saxons. But the learned Grotius deduced, as the court justly says, the principles of natural law, and the laws of nations from the writings of the philosophers, poets, historians, and orators of antiquity. From none of the ancient poets did he draw more largely than from Homer, and he must have seen this "*idea*" emblazoned on the shield of Achilles, as a faithful picture of a still earlier age. Pope thus renders the passage :

> " Two cities radiant on the shield appear
> The image one of peace, and one of war.
> Here sacred pomp and genial feast delight,
> And solemn dance, and hymenial rite ;
> Along the street, the new made brides are led,
> With torches flaming, to the nuptial bed ;
> Through the fair streets, the matrons in a row,
> Stand in their porches and enjoy the show—
> There in the forum swarm a numerous train
> The subject of debate, a townsman slain :
> One pleads the fine discharged, which one denied ;
> And bade the public and the law decide—
> The witness is produced on either hand,
> For this or that the partial people stand—
> The appointed heralds still the noisy bands,
> And form a ring with sceptres in their hands,

HERMANN
*v.*
CARROLLTON R.R.

On seats of stone within the sacred place,
The reverend elders nodded o'er the case;
Alternate each the attesting sceptre took,
And rising solemn each his sentence spoke,
Two golden talents lay amidst, in sight,
The prize of him who best adjudg'd the right."

Now supposing it to be true, as stated in the opinion, that this author did not profess to treat of jurisprudence, but merely deduced the principles of natural law, and the laws of nations from the writings of the philosophers, poets, historians, and orators of antiquity, not confounding one with the other, but carefully distinguishing both from the civil or municipal law; yet here was an example before him, both of the recognition of this indemnity as a civil obligation, and of its actual enforcement in a court of justice. Strange indeed, then, would it be, if Grotius *really* had placed it on "any ground, excluding all idea of its forming a part of the civil law, or being the basis of an action." Strange if he had *indeed* treated this indemnity as "a matter of gift or liberality, an affair of conscience, rather than an obligation of strict duty." But such is far from being the case, and we regret to be forced to say that all these views of his doctrines are, as we respectfully contend, totally erroneous. Grotius certainly did treat of jurisprudence, not only in its application to States and Empires, but to individuals, their rights and their obligations. His writings are and have always been quoted by lawyers in courts of justice.

The title of the very chapter 17th, of book 2d, quoted by the court, is, de damno per injuriam dato, et obligatione quœ inde oritur. "Of the damage done by an injury, and of the obligation thence arising. This chapter is divided into 22 paragraphs, in which the subject is treated in its natural order, and as a practical legal question. It is unnecessary to quote the original, in this argument; and I shall, instead of giving my own translation, use an approved one made in 1715, by an association of scholars in London:

§ 1. We have already shown, that a "man may have a right to a thing three several ways: either by contract, by injury done him, or by law. Of contracts we have fully treated. Let us now come to the right, which arises by the law of nature, from an injury received. We here call any fault or trespass, whether of commission or omission, that is contrary to a man's duty, either in respect of his common humanity or of his particular quality or station, an injury. From such a fault or trespass, there arises an obligation by the law of nature, to make reparation for the damage, if any be done."

The provisions of our own Code are almost identical with this. It will be seen in the further development of the principle in this chapter, that Grotius not only does not, as it is erroneously supposed, consider the indemnity in case of unjust homicide as an imperfect obligation, from which no civil action can arise, but that he most clearly enforces the very reverse. In the second paragraph, he says, "the word *damnum*, damage, probably derived from *demo*, to take away, is when a man has less than his right, whether that right be merely from nature or some superadded human act—such as property, contract, or *law*. A man's life is his own by nature, (not indeed to destroy, but to preserve it,) and so is his body, his limbs, his reputation, his honor, and those actions that peculiarly belong to him as a man." He then clearly distinguishes the obligation arising from this damage or injury to a right from imperfect obligations; "but from a mere aptitude or fitness, which is less properly called a right and rather belongs to distributier justice, arises no true property, and consequently no obligation to make restitution, because a man cannot call that his own, which he is only capable of or fit for." "For," as Aristotle observes, "he does not transgress the rules of justice, who out of tenaciousness refuses to relieve a poor man with his riches." He further illustrates the principle, that the obligation to make restitution is founded on the violation of a right; "a citizen, not unqualified, although he has no proper right to a place or office, yet the right of being a candidate truly belongs to him, and if he be hindered, either by force or fraud, from exercising this right, he may require satisfaction, not according to the full value of the place, but the uncertain damage he sustained thereby."

"He has the same right to sue for satisfaction, to whom a testator would have left a legacy, but by force and fraud was hindered. For to be qualified to receive a legacy, is a certain right, and consequently to deprive a testator of his liberty of bequeathing it is an injury."

In the 9th paragraph, it is laid down, that "he that doth not dissuade when he ought, or conceals the fact when he ought to have discovered it, is liable in damages. In all which cases, the word ought, has only respect to that right which is properly so called, and is a part of commutative justice, whether it arises from the law, or from any quality in the person. For if it be due only by the rules of charity, the omission of it is indeed a sin, but does not oblige him to make reparation, which, as before said, arises only from right, properly so called."

In the 12th paragraph, it is stated, that "he that is bound to make reparation for the fact, lies under the same obligation in regard to its consequences. In one of Seneca's controversies, this question is handled, in an instance of a plane tree set on fire, whereby a house was burnt; when he gives us this as his opinion upon it. Although you were unwilling to have done part of the injury, yet you are bound to make reparation for the whole, as much as if you had intended it. For he ought to have been unwilling as to the whole, who would excuse himself through ignorance or unwittingness. Ariarthes, King of Cappadocia, damming up, through wantonness, the passage of the river Mele-nes, forced its waters out of their channel, whereby they so swelled the river Euphrates, that it swept away part of the Cappadocian lands, and did great damage to the Galatians and Phrygians, whereupon the case being referred to the Romans, he was adjudged to pay 300 talents damage."

Having thus explained the general principle, Grotius proceeds to state several instances of its application. Let it be borne in mind that he had explicitly de-clared that the obligation to make reparation for the damage caused by an in-jury, arises only in cases of the violation of a right: where the party injured has less than is his right, or is deprived of something which belongs to him absolutely; and that in order to remove all doubt, he had also declared that this obligation did not arise from the breach of any of those duties which are imposed upon us only by religion or humanity—as charity, benevolence, grati-tude and the like. And let it be also noticed, that each and every instance he now enumerates, is one of a violation of what he had already classed as a right, and that in almost every instance he indicates the measure of the damages or reparation, and the standard of estimation.—§ 13, *Exemplo hœc sint.* Take these instances that follow, as examples: he that kills a man unjustly, is bound to pay all expenses which may have been incurred for physicians or surgeons, and to give to those whom the person slain was from his relation accustomed to maintain—such as his parents, wife and children—so much as their hope of that maintenance was worth, regard being had to the age of the person slain. § 14. He that maims another, is obliged in like manner to pay for his cure and to make him satisfaction for the loss of his limb, because he is hereby ren-dered incapable of getting so much by his labor as he might otherwise have done. Several other injuries are cited, in which reparation may be required, and among them, assault and battery, slander, theft and robbery, procuring a contract or promise, by force, fraud or unjust terror.

It is nowhere intimated that the case of unjust homicide stands on a different footing from the other cases. The obligation to make reparation in damages and in money, is treated in every case as a civil obligation which may be en-forced, and is deduced from this general principle, viz: "that from any such fault or trespass, there arises an obligation by the law of nature to make repa-ration for the damage, if any be done." A principle which is identical with that embodied in our Code. We have then the authority of Grotius for assert-ing that an action of damages for unjust homicide, is fully warranted by the Articles 2294 and 2295 of our Code; and it will be recollected that we have no "special statute," other than those provisions authorizing actions of slan-der, false imprisonment, assault and battery, and the like.

The opinion also says: "Rutherford, in his Institutes of Natural Law, dis-sents from the opinion of Grotius in his discrimination between the valuation of the life of a free man and of a slave, and thinks that in the case of the slay-ing of either, his life can be estimated according to the interest which those who survive have in it." Book 1, c. 17, § 9.

The views of Rutherford seem to us to be clearly correct. He says: "Gro-tius here distinguishes between the murder of a free man and the murder of a slave. The life of the former cannot, he says, be reckoned in settling the damage done by his death, because no person has any claim to it but himself; but the life of the latter is to be reckoned, because, if the slave had been alive,

the master might have sold him, and consequently his life itself is of value to the master. But if we observe that the life of the slave can no otherwise be looked upon as the master's property, than, as he had an interest in it, we shall find that there is no occasion for this distinction, since, as far as the relations of a free man had an interest in his life, the person who murdered him is obliged to make them reparation. So that in either case, in settling the damages, the life of the deceased is estimated according to the interest which those who survive him might have in it."

We rely ourselves on Rutherford to show to this court more fully, if need be, the true doctrine of Grotius on this subject. His work is one of standard authority, and is the substance of a course of lectures delivered in an English University on *Grotius de jure belli et pacis.* In this particular chapter, which is on the subject of reparation for damages done, he shows how carefully Grotius had distinguished between those imperfect rights, the violation of which is no foundation for demanding reparation, and those perfect rights, for a violation of which a civil obligation to repair them arises, and may be enforced by a civil action. He also shows that Grotius classes this among the perfect rights, to be vindicated by an action.

In the very paragraph quoted in the opinion, he says: "Grotius has applied these general rules concerning reparation to several particular instances. He who kills another unlawfully is obliged to defray such expenses as the person killed may have been at in endeavoring to have his wounds cured. He is obliged, likewise, to make amends to those who had a right to be maintained by the deceased, such as his wife, his children, or his parents, according to the value of what they might have expected to receive from him, considering his age, his fortune or his employment. It may, perhaps, be questioned whether they had a strict right to such maintenance or other benefits as they might have received from the deceased; and if they had not, it may be asked, what restitution can be due for the loss of that maintenance or of those other benefits? But to this we answer, that however they might have been disappointed in their expectations, yet the expectation itself was their own, and it is a real injury to take it from them. All, therefore, which can be proved from this objection, is no more than we allow, that the reparation is to be estimated, not according to the worth of their maintenance or of their probable benefits, but according to the worth of their expectations."

The Chief Justice proceeds (6 An., 510): "It is understood that the present action is founded upon the direct injury to themselves by the death of *Hubgh*, from the causes alleged in the petition, and is not attempted to be maintained as a right transmitted to them through the deceased. The right of action is claimed on the same ground on which it has been allowed in France, the Articles of the Codes of that country and of Louisiana being identical, which provide that every act whatever of man, that causes damage to another, obliges him by whose fault it happened to repair it. (Code Napoleon, 1383; L. C., 2294.) A very thorough consideration of the subject brought us to the conclusion that the interpretation and application of the Article 1382 of the Code Napoleon, adopted by the Court of Cassation, in relation to the responsibility of the slayer to the widow and heirs of the deceased, were not consistent with our jurisprudence, and consequently inadmissible."

Now, under these admissions, it would seem to be incumbent on the learned Judge to point out in what respect and for what reasons the interpretation and application by the Court of Cassation of so important an Article of the Code Napoleon, from which ours is literally copied, is "not consistent with our jurisprudence, and consequently inadmissible."

That our Supreme Court has always accepted assistance from the Court of Cassation, and from eminent French jurists, in the construction and application of Articles of our Code, similar to those of the Napoleon Code, is well known, and is admitted in this opinion. It has also exercised full independence, and rejected such authority when our own jurisprudence differed. But it is believed no case has arisen in which it has rejected such authority without being able to show, either that there was something opposed to it in our jurisprudence, or that their reasoning was fallacious or unsound. In this instance there was a peculiarly strong necessity for showing this dissimilarity, because it was not doubted that an action for damages for the killing of a slave, *a human being*, was, under this very Article, sanctioned in Louisiana. In the very volume containing this opinion is found the case of *Carmouche* v. *Bouis*, p. 95, in which

it was decided by the same court that where "one of the defendants, the father of the other, had directed the other to guard the sugar cane field from depre- dations of negroes, the field having been previously visited by such trespassers; and while on the watch, the son saw a gang of negroes mounting the fence to enter the field, and wounded one of the negroes, so that he died; that both father and son were liable to the owner for the value of the negro, and that it was immaterial whether the slave was wounded carelessly or intentionally. If the son fired without taking aim, and in pursuance of the instructions of his father, to frighten the negroes, he must have fired carelessly, and is responsible for the injury;" and the court relies on Article 2295, one of those on which we rely.

The case of *Bibb et als.* v. *Hebert*, 3 An., 132, is referred to in this decision. In that case, Chief Justice Eustis said : "We do not think the killing of the slave in the act of committing larceny within the enclosures of defendant was necessary for the defence of his person, his family, or even his property, and consequently was not justifiable, and that he is bound to pay the owner for his loss by reason of his death."

The reason given in the opinion why the interpretation of this Article by the Court of Cassation is inadmissible here, is that the system of laws prevailing in Louisiana is materially different from that prevailing in France. In proof of this supposed difference, it is said that our laws were derived from Rome and from Spain, and not from France. That although the Article of our Code was copied literally from the Napoleon Code, it merely embodied a principle well known in the Roman and the Spanish laws, and was enacted at a time when the Spanish law was the law of Louisiana, that they can find no trace of such an action in the Roman or Spanish laws. That various customs prevailed in the different territories of France before the empire of the Code which "sought to make a compromise, as it were, between the customs and the Roman law." This, surely, does not prove the difference. It is well known that the laws, both of France and Spain, were mainly derived from the Roman law. This very Article, (1382) this opinion tells us, was found in principle and even in terms both in the Roman and Spanish laws. It was, therefore, necessary to show that there were limitations affixed to it in Spain and in Rome, which have been disregarded in France, but which are binding with us. Judge Rost's views would seem to be the more logical, when he says: "The dispositions of Article 2294 are found in the Roman and Spanish laws, so far from being new legislation, that Article embodies a general principle as old as the science of jurisprudence itself, and it must be understood with *the limitations* affixed to it by the jurisprudence of Rome and Spain." p. 497. What were those *limitations?* That is precisely what it is incumbent on any one to show who contends that it should receive a different interpretation here from what the most enlightened jurists have given it in France, when it is conceded that both countries derive it from Rome, and as the principle itself, without limitation, would embrace such an action. Neither of these opinions mention any such limitation, nor do they undertake to say positively that no such action was allowed in Rome or in Spain. The language is peculiar: "It is certainly incumbent on the plaintiff to show that, under our laws, the death of a free person can be the ground of an action of damages. That as a general principle, no such rule prevailed under the Roman law, we think, may be affirmed. If it existed, it has escaped the research of Gibbon and Makelday." "Far be it from us to undertake to state affirmatively that any given text is not to be found in the mass of matter composing the Corpus Juris Civilis. Finding no rule laid down in any of the elementary writers on which the action could be maintained, and bearing in mind the principle so frequently recognized in the Digest, that the life of a free man cannot be made the subject of valuation, we thought that an action of this kind could not lie under the Roman law." "We can find nothing in the laws of Spain which authorizes this action, or which presupposes any such right of action to exist, and are satisfied that, as a general rule under both systems, actions for injuries to the person are strictly personal; and that there is no recognized principle in either on which the plaintiff's action can be maintained." p. 510.

But let us go to better authorities on this subject that the Compendium of Makelday, or the condensed chapter of Gibbon. They both, however, speak of the principle on which such an action is founded. Gibbon says: "The general duties of mankind are imposed by their public and private relations;

HERMANN
v.
CARROLLTON R.R.

but their specific *obligations* to each other can only be the effect of, one, a pro= mise; two, a benefit; or three, an injury. And when these obligations are ratified by law, the interested party may compel the performance by a judicial action." 4th vol. c. 44, p. 287. And again: "Nature and society imposes the strict obligation of repairing an injury; and the sufferer, by private injustice, acquires a personal right and a legitimate action."

The Roman and the Spanish laws, cited in this opinion, show the application of this principle to cases of homicide, both in Rome and in Spain. As to Rome, the opinion says: "The Acquillian law gave actions for injuries done by slaves and certain animals, which it mentions by name. The title, *de his qui effun-derint vel dejecerint,* thus provides for the case of a free man killed by some-thing being thrown in the public way from a building. If it is a free man who has been killed, damni œstimatio not fit in duplum, quia in homine libero nulla corporis œstimatio fieri potest; but in this case the fine is of fifty pieces of gold, ff., lib. 9, tit. 3. § 3. The law *de suspensis* is to the same effect, and had for its object the prevention of accidents in the public way. They were penal laws, and the special provision they contain are rather in affirmance of the non-exist-ence of the principle which would give an action to the heir for damages caused by the death of his ancestor." Now this passage intends to convey the idea, and indeed it almost expresses it in terms, that these two last laws authorized merely criminal prosecutions, and not civil actions for damages, and that the express provision for one is a strong negation to the other as to which they are silent.

In this there is great error. To show it, we need go no further than the authority of Merlin in the passage cited in this opinion, where he gives conclu-sions, as the Imperial Attorney General, in the case of *Mitchel* v. *Reynier et al.* "Every one knows," says Merlin, "that in the Roman law, the word *accusator* answers to what we call plaintiff (*plaignant*) or civil party (*partie civile*). Every one knows that in the Roman law the prosecution of crimes was not re-served, as among us, to the magistrates, and that it belonged to all private in-dividuals." Merlin Rep., Reparation Civile, § 2, 3, bis.

Under the Acquillian law, the owner of an injured slave might not only bring his civil action, but prosecute criminally. Brown's Civil Action, vol. 1, p. 401, speaking of this law, *de his qui effunderint,* etc., this author says: "The next kind of trespass which the civil law especially dwells upon, is the careless throw-ing or pouring down (though without mischievous design) of any thing, where-by damage is occasioned to the person, goods or clothes; and here it is minute in ascertaining whether the owner of the house or his tenant inhabiting therein, or the occasional sojourner, or the immediate agent where many dwell in the same house, shall be liable to the penalty recoverable for the negligent precipitation of the instrument of mischief. This penalty, if damage was done only to the property was double the estimate of the damage done. If the person was in-jured, the penalty of accidental homicide was ascertained by law at fifty aurei; that of wounding was left to the discretion of the *judices;* but the law was ex-tremely liberal in valuing the lost time and labor of the man who was thus perpetually rendered unable to work, since it estimated his life at an hundred years, the utmost extent of probability." Vol. 1, p. 408.

The edict of the Prætor, referred to in the opinion, is as follows: "Prætor ait de his qui dejecerint vel effunderint; unde in eum locum, quo vulgo iter fiet, vel in quo consistetur dejectum vel effusum quid erit, quantum ex ea re damnum datum factumve erit, in eum qui ibi hebitavert, in duplum judicium dabo. Si eo ictu homo liber perisse dicetur quinqua gento areorum judicium dabo. Si vivit nocitumque ei esse dicetur, quantum ob eam rem œquum judici videbitur, eum cum quo agitur, condemnari, tanti judicium dabo." Dig., lib. 9, tit. 3.

On this Ulpian comments: "Summa cum utilitate, id Prætorum edixisse, nemo est, qui neget: publice enim, utile est sine metu et periculo per itenera commeari."

Which may be rendered: That this edict was of the highest utility no one denies, for it is of public utility that the highways may be traveled without fear or danger.

It will be seen by looking into the commentators, that this edict applied not only to cities and villages but also to all places where people were accustomed to pass.

Voet, in his commentary on the Pandects and on this edict, lib. 9, tit. 3—de
his qui effunderint vel dejecerint, says:

No. 1.  Non privatim modo, sed et publice interest, ut tuta, et sine damni
metu, commiantibus via set.  L. 1, § 1, ff. 12.  Tuta vero non est, si quid illic
dejiciatur aut effundatur, ponatur aut suspendatur, ex quo contingere loesio
posset quo de re, edictum pretoris ad viarum securitatem propositum est, in
duas divisum partes.

Which means:  That it is important, not only to individuals, but to the whole
public, that the public highways should not only be safe but free from the ap-
prehension of injury.  But they would not be safe if anything was thrown or
poured, placed or suspended upon them, from which injury might happen.
Hence the edict of the Prætor, respecting the security of highways, was pro-
mulgated, divided into two parts.

On this edict Ulpian further comments:

§ 4.  Hæc in factum actio in eum datur qui inhabitat, etc.

§ 5.  Sed cum homo liber periit damni estimatio non fit in duplum: quia in
homine libero nulla corporis æstimatio fieri potest, sed quinquagenta auriorum
condemnatio fit.

That is;  This action for the injury is given against the person who inhabits
the house.

But if a free man is killed, the estimation of the damage is not made in
double, because no estimation of the body of a free man can be made, but
judgment is rendered for fifty aurei.

This action, it will be seen on consulting the commentators, resembled the
English *qui tam* action.  It might be brought by any one.  If the freeman,
who was injured, survived, he might bring it at any time.  If another wished
to bring it, he must do so within the year.  But among several persons claim-
ing this action in case of the killing of a free man, it must be given to him
whose right is the best, or who was related to the deceased by affinity or con-
sanguinity.  The words of Ulpian are:

"Dummodo sciamus, expluribus desiderantibus hanc actionem ei potissimum
danri debere, cujus interest; vel qui acfinitate cognationere defunctum con-
tingit."

Voet, in his commentary on this edict, says (§ 4, lib. 9, tit 3) *de his, etc:*

" Quod si homine libero per dejectionem vel effusionem nocitum sit, cuivis
quidem expopulo intra annum popularis actio datur, sed loeso ipso in perpetuum,
ad impendia in curationem facto, et æstimationem operarum quibus læsus caruit
et in posterum cariturus est, nulla cicatricum, deformitatis, dolorisive habenda
ratione."

Si liber homo inde perierit ad quinquginta aurios actio in factum comparata
est, eaque annalis et popularis:—Dummodo sciamus, ex pluribus desideranti-
bus hanc actionem ei potissimum dari debere, cujus interest, vel qui affinitate
cognationeve defunctum contingit.

These last are the exact words of Ulpian, already quoted.  Voet then im-
mediately adds: ut tutu uxoris, liberis, quos etiam hodie non præcise ad
aureos quinquaginta agere obtinuit, sed ad id, quanti judicii videbitur ob vic-
tum, quem occisus potuissit iis probabiliter præbere.  Groenewegen, et Parens
p. mem. Paulus Voet, add § 1, Instit. de obligat. quæ quasi ex delicto mem. 2.
Qualis eteam hæc petendo, non videri se gessisse pro herede, dicetur plenius,
tit. de acquirer vel omit. hæred.

From this it is seen that Voet mentions the wife and children as those stand-
ing nearest to the deceased and as best entitled to the action, and that when
he wrote they were not limited in their demand to fifty aurei, but might re-
cover so much as might appear to be just and equitable, on account of the
support which the deceased could probably have afforded them.  These cita-
tions might be multiplied, but it has been sufficiently shown that in Rome a
civil action was given for the killing of a free man, in which those nearest to
him, as his wife and children, were preferred, although the recovery was limited,
and that in Holland, whose jurisprudence was drawn from Rome, the restric-
tion of the claim to fifty aurei was abandoned and a more rational rule substi-
tuted.  It is sufficient for our purpose to show that the principle was applied
in Rome to the case of the killing of a free man.  Having fully shown it, then
there is nothing in the Roman law to prevent the application of the principle
here to the case of the killing of a free man.  If in this case the claim of the
wife and children was for fifty aurei, it would be in exact conformity with the

Roman law. Our law makers have not thought proper to prescribe any such limitation, but have left it as in all other cases of damages for offences or quasi offences, to the discretion of the Judge and jury. C. C. Art. 1928.

As to the Spanish law, the 25th law, tit. 15, Partida seventh, is evidently taken from this edict; it is as follows:

LEY XXV.—Como el que echare de su casa huessos, o estiercol, en la calle, deue pechar el daño que fiziere a los que passaren por y.

Echan los omes a las regadas de las casas donde morau, de feura en la calle agua, o huessos, o otrás casas semegantes; e magur aquellos que las echan non lo fazen con intencion de fazer mal, pero si acaesuesse, que aquello que asse echassen fiziesse daño, o en paños, or en ropa de otras, tenudos son de lo pechar doblado los que en la casa Morau. E si por auentura, aquello que assi echasse motasse algun ome, tenudo es el que mora en la casa de pechar ceneuenta marauedis de oro; la meytad a los herederos del meurto, e la otra meytad a la camara del Rey; porque son en culpa, echando alguna cosa en la calle pos do passan los omes, de que puede renir daño a otri. E si muchos omes morassen en la casa, donde fuesse echada la cosa que fiziesse el daño, quier fuesse suya, o la tuniessen alogada, o emprestada, todos de so vuo son tenudos de pechar el daño, si non sufriessen ciestamente qual era aquel por quien rino. Pero si le sufriessen, el solo es tenude de fazer emienda dello, e non los otros. E si entre aquellos que morassen cotidianamente en la casa, oniesse alguno que fuesse huesped, aquel non es tenudo de pechar ninguna cosa en la enuenda del daño que assi acaesciesse; fueras ende, si el piesmo lo oniesse fecho.

It will be seen that in the English translation known as Moreau & Carleton's Partidas, an important part of this law is omitted. It is this: "and if by chance something thus thrown out should kill some man, he who dwells in the house shall be bound to pay fifty gold maravedis; the half to the heirs of the man killed, and the other half to the treasury of the king."

The case of the barber, referred to in the opinion, also shows the application of the principle in Spain to a civil action of damages, for the killing of a freeman. See Law 27, tit. 15, Partida 7, most of which was omitted in the translation of Moreau & Carleton.

We quote a part of the note of Gregorio Lopez on this law:

"Barbitonsor exerceat officium suum in locis separatis non publicis. Et si alicujus culpa damnum dedit, dum exercebat officium, tenetur occassionans damnum ad illud; si autem sequatur mors, ad damnum, et etiam ad homicidii pœnam," etc.

Partida 7, tit. 9, law 21—"Whoever receives a wrong or injury, may demand reparation in either of the two following ways—at his option. The first, by causing the party who does the injury, to make amends in money; the second is by criminal prosecution, praying that the Judge inflict upon the wrong-doer such punishment as, in his discretion, he shall think he deserves. And one of these actions destroys the other, inasmuch as when once the party injured has selected one of them, he cannot abandon it and have recourse to the other." By law 11, Ibid—When a man is sick, of the disease of which he died, and in that condition is wronged, his heirs after his death may sue for damages for the injury done, both to him and them. And so by the 13th law, if creditors "detain the body of a dead man or refuse it burial, or dishonor it, or if one maliciously defame the memory of a person deceased, his heirs may demand reparation therefor in the same manner as if the words had been uttered against themselves, because in law the deceased and his heirs are considered as but one person." And by law 23, the heir may demand reparation for injury done to the person from whom he inherits, if the deceased had instituted a suit therefor, before he died, and issue had been joined upon the same. Or if the injury had been done to the deceased while he was afflicted with the infirmity of which he died, or if the injury or wrong was committed after his death. 7 Partida, tit. 15, law 3. "He who causes damage, shall make reparation therefor, to the person who received it—whether it had been done by himself or by his command or advice, or had happened through his fault."

From these citations it will be seen that it was not a rule in the Spanish nor Roman laws, to the extent intimated in this opinion, that actions for injuries to the person were strictly personal. See also Domat of Hs. and Ex. in gen. tit. 1, sec. 10.

In aid of the argument, that the construction put upon Art. 1382, by the Court of Cassation, cannot afford a safe guide to the courts of Louisiana, be-

cause the jurisprudence of the two countries in regard to it are materially different; the opinion, quotes Merlin, "in giving his conclusions before the Court of Cassation, in the case of *Michel Reynier et als.*, respecting the Art. 1382 of Code Napoleon, which is identical with the Art. 2294 of our Code. Merlin Rep. *verbo* Rep. Civ., § 2, 3 bis. 6 An. 511.

An examination of the case referred to, and the circumstances under which Merlin used the expressions quoted in the opinion, will show, we think, that instead of supporting the supposed difference between the jurisprudence of Rome and France, it proves their exact conformity with each other.

*Michel* had instituted his suit, making himself civil party (*partie civile*) in 1812, against *Reynier*, *Boissiere* and *Guille*, accusing them of forgery, to his injury.

They were acquitted, and in their turn sued *Michel*, each for 600,000 francs, as damages for his false accusation.

*Michel* was condemned by the jury to pay these damages, and after judgment rendered, an appeal was taken; and the principal question before the Court of Cassation, as stated by Merlin was, whether from failing in his suit, *Michel* must necessarily be considered as having acted, in accusing the defendants, with such rashness, imprudence, and negligence, as to make him responsible to them in damages.

Merlin says: "No; because he might, notwithstanding their acquittal, have had very good reasons for prosecuting them. He may have been determined to do so, by reasons which would have determined the most cautious and conscientious man, and, in that case, no reproach can attach to him, and no damages be demanded." Then he says, as quoted in the opinion, "the principle which is written in the Article 1382 of the Civil Code, is not new. It is drawn from the natural law; and long before the Civil Code, the Roman laws had solemnly proclaimed it; long before that Code, the French laws had recognized and assumed it." He then proceeds: "Well then, did the Roman laws and our ancient jurisprudence, attach of full right to this principle, the consequence which *Reynier* and *Boissiere* pretended now to derive necessarily from the Article 1382 of the Civil Code. No, and very far from it. The Roman laws distinguished three cases, where the accused failed in his action: one where he was convicted of having accused falsely and knowingly: another where he was convicted of having accused rashly (*temerairement*); a third, where he was acknowledged to have had just reasons for accusing, although his accusation was rejected for want of sufficient proofs."

"In the first case, the accuser suffered the public punishment denounced by the law, *Remnia*, against calumny. In the second case, the punishment for calumny could not be afflicted on the accuser. But then there remained to the accused, who had been acquitted, a private action *actio injuriarum* against the accuser convicted of rashness, and he was condemned to pay damages. In the third case, the accuser was protected, not only from the public punishment of calumny, but even from all actions of damages."

Merlin, after citing several texts of the civil laws, proceeds: "Let it not be said that these decisions of the Roman law are only applicable to officers of the public ministry. Every one knows that in the Roman law, the word *accusator*, answers to what we call complainant, (*plaignant*) or civil party (*partie civile*); every one knows that in the Roman law, the prosecution of crimes was not reserved, as with us, to the magistrates, and that it belonged to all private individuals. As to our ancient jurisprudence on this matter, it is necessary to its correct knowledge, that we should fix our attention upon two different epochs—that which preceded the ordinance of 1670, and that which commenced with the ordinance. Before the ordinance of 1670, our ancient jurisprudence was absolutely chalked out (*calquée*) on the decisions of the Roman law, which we have just recalled to memory. If, like the Roman law, it punished by a public penalty the accuser whose accusation was judged calumnious; if, like the Roman law, it punished with damages the accuser, whose accusation was judged not calumnious but rash (*téméraire*); like the Roman law, also, it freed from all responsibility the accuser whose accusation, although rejected for want of sufficient proof, had been prompted by just causes."

We think it has been shown, that there is no such dissimilarity between the jurisprudence of Louisiana and that of France, as this opinion endeavored to establish. That far from having had their origin in the customary laws of France, the article of the French Code, and its "application and interpretation by

the Court of Cassation," can both be traced to Rome. That even in Rome the principle was applied in cases of homicide of a free man, though with a limitation founded on an artificial maxim, which can have no controling authority with us.

For the laws of Scotland on this subject—we refer to Erskine's Institutes (by Ivory); Bell's Principles of the law of Scotland; The Dictionary of Decisions, under the head Reparation. To show how this subject is viewed in England, in relation to the statute 9 and 10 Vict., we refer to *Blake* v. *The Midland Railway Company*, 10 Eng. Law and Equity Reps. 443. This case shows that the Court of Queen's Bench, considers the loss and injury sustained by a widow and children, by the death of the husband and father, as susceptible of pecuniary estimate.

As to the argument of the presumed general opinion of the bar, that no such action can be maintained, drawn from the fact, that up to the case of *Hubgh*, no such a suit had been brought—it will require but brief notice—it seems to be a very forced conclusion. The fact that no such suit had been brought, might easily be accounted for, without presuming any such " uniform understanding of the bar." It is only of late years, and since the introduction of railroads, that the necessity of such a remedy has been forced upon the public attention in this country and in England. But granting to this argument its utmost weight, it will only prove, that if indeed our laws do authorize the action, the bar has labored under a general mistake. The probability is, that the subject had never engaged, to any extent, the inquiries of the bar; and it would be more satisfactory to know what their opinion is now, since their attention and researches have been attracted to it.

Lord Chief Justice Pratt, in answer to an objection of novelty, said:

" Torts are infinitely various; there is nothing in nature which may not be an instrument of mischief; and the special action on the case was introduced, because the law will not suffer any injury without affording a remedy, and there must be new facts in every special action on the case."

Justice Ashurst said:

" That when a case was only new in instance, and the only question is on the application of a principle recognized by law to such new case, it will be just as competent to courts of justice to apply the acknowledged principle to any case which may arise two centuries hence, as it was two centuries ago."

The late Supreme Court declared: "That it was equally the boast of our law and the English law, that there is no right without a remedy, and no wrong without adequate redress." If then, under this Article 2294, no action can be allowed in this case, it can only be because the act complained of cannot cause damage, or wrong and injury to the widow and children, and is as to them *damnum absque injuria;* a conclusion which this honorable court would not adopt.

It being evidently impossible in any Code to provide specific rules for every case: our Code, Article 21, provides, that " in civil matters, where there is no express law, the Judge is bound to proceed and decide according to equity. No suitor then need go unredressed. "To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent." The concurrence of mankind in different ages and countries, is regarded as the highest evidence of what is natural law and reason. There has been such general concurrence, in regard to the right of relations to claim damages for homicide, in all nations and ages of which we have records.

From the earnest manner in which this action has been opposed, it might be supposed that it was a legal heresy—an innovation fraught with mischief. " The present state of things on this subject," says this opinion, page 514, it would not be proper to disturb for light reasons, or, for anything short of a clear and decided command of the law."

And what is the present state of things? Let the numerous steamboat and railroad disasters—launching hundreds of human beings into eternity, and filling the land with mourning—answer the question. Let this opinion answer it, when it says—page 509—"The frequency, of late, of deplorable accidents of this kind, has created a general sentiment of indignation against those who, by their neglect or recklessness, are the causes of so much suffering among the relatives of the unfortunate victims. The impression that they ought to be indemnified, results from a sense of justice which all right-minded men must acknowledge."

Experience has proved that this crying evil cannot be corrected by the criminal prosecution of subordinate agents; and that the only plan is, to enlist on the side of safety the vigilance of those who reap the profits, by holding them responsible in damages.

We ask nothing new. In the case of *McGary* v. *The City of Lafayette*, 4 An. 440, the late Supreme Court said : " The general rule of law under which damages are allowed in our system of jurisprudence, is in these words : "Every act whatever of man that causes 'damage to another, obliges him by whose fault it happened. to repair it.' " C. C. 2294. "Under that rule, the reparation made must be equal to the injury inflicted." The case is, in the language of Justice Ashurst, "only new in instance." "The only question is on the application of a principle recognized by law to such new case."

We ask the court to apply it to this case of undeniable injury, in the same way that it was applied, as we have shown, to the case of injury by the unlawful killing of a slave. We ask the court to apply it, as it has always been applied in that enlighted country, from whose Code we copied it. And so far from its being at variance with any thing in the laws from which our jurisprudence is derived, we show that it was so applied in Rome and in Spain, and that in this instance it is in the very spirit of that Pretorian edict, which had for its object the security of highways.

The examples of England and of the States of this Union are referred to in these opinions, in support of the opposition to this right of action. And yet, at the very time they were written, England and these States had, under the influence of improved civilization, thrown off the ancient shackles of the common law, which had previously denied civil redress for this great injury, and had by express statues, provided the remedy so loudly called for by justice and by policy.

Counsel for defendants made the following argument :

It does not seem to the undersigned, to be necessary to make any reply to a large portion of the brief of the learned counsel. His observations concerning the erroneous translation of the quotation from Grotius, may be correct ; but this has no possible bearing on the question of the existence of the legal obligation on the part of the defendants to compensate the heir. The court recognizes it as a natural obligation, and whether Grotius considered it as a mere liberality or charity, or an imperfect or a natural obligation, seems really to have little bearing on the main question, because it is conceded in the opinion, that the obligation is considered by the most approved writers on natural law, to be a duty. Under this view of the subject, the undersigned will have to leave the first forty pages of the brief of counsel without any other reply than that afforded in the opinion itself, being certain that the whole will receive the attentive consideration of the court.

The decisions of the Court of Cassation have never been recognized as authorities in this State. The first jurists of France give them no such weight, even in France, and on many subjects the difference of government, manners, usage and race, and origin of laws between the two countries, render them quite inapplicable here. Besides this, they are frequently changed, and those among us most familiar with that jurisprudence, never have insisted on them as any thing more than expositions of the law of France by the highest court.

The court came to the conclusion, that as no valuation of the life of a freeman could be made under the Roman law, no action of this kind could be maintained under that system. The principle is laid down as elementary in the Digest and the commentators on the Roman law. The court conceded there were laws which seemed to be in conflict with this principle ; but on an investigation of the whole subject, the court came to the conclusion that these laws were exceptions which proved the rule. That the court was right in stating the principle to be an elementary one, cannot be questioned. To this day, the principle stands as a rule in the law of insurance and the maritime law.

The Roman law establishes this general rule, that every thing preserved by the jettison is to contribute to the payment of the value of the object thrown overboard. Placuit omnes quorum interfuisset jacturum fieri conferre oportere. It exempts from the rule only the persons of freemen, *capita libera*, and things intended for consumption on the voyage, such as provisions ; but it subjects to contribution the garments of every passenger, and even the ring he wears on his finger.

3

HERMANN
v.
CARROLLTON R.R.

Since the person does not contribute to the jettison, why should the garments and ring which are accessories of the person contribute? Faber answers, that the person of the freeman is exempt from contribution, because it is without price. Duaremus, on commenting on this law, begins by establishing the general rule, that all that is preserved and is susceptible of being valued, is to contribute to the jettison. Thence he concludes, that the person of the freeman is not subjected to contribution—Quia liberum corpus non recepit æstimationem, &c.

Emerigon on Insurance, chap. xii, sec. xlii.

The late Chief Justice of England, Lord Tenterden, in his Treatise on Shipping, thus states the law on this subject:

"Slaves, also, who are considered as a species of merchandise, their proprietors formerly contributed according to the value; although this dreadful trafic had not extended so far as to authorize the casting of these unhappy persons into the sea. But as no estimation can be made of the value of the life of a freeman, neither passengers nor crew are to contribute for their personal safety. Abbott on Shipping, p. 403."

Thus we find that so unbending is this rule as a general principle of law, that to maintain its operation, the first principles of right and equity are sacrificed. A man is exempted from contributing to the means of saving his life, because his life is beyond all price, and the stern policy of the law prohibits any attempt to fix its value.

Texts in the Roman Digest and Codes are to be found wherever the subject called for them, in which the principle is repeated, so that the court was bound to assume it to be elementary.

Every thing which was within the research of diligent inquirers after truth, was before the court, and the opinion of the court is the conclusion drawn from the very thorough examination of the writers on the Roman law. Indeed, it seems that in this branch of the argument of the counsel, the authorities adduced by the court are his main reliance in the attempt to refute its opinion.

The undersigned can have no objection to submit the subject to the deliberate judgment of this tribunal, on this state of argument. A few remarks, however, are perhaps due to the convictions and zeal of our opponent, as manifested in his elaborate argument.

The submission of the matter in this form of discussion, will simplify the subject and relieve it from the incumbrance of texts and commentators, in the labyrinth of which the most learned become bewildered and the wisest lose their scent. In an inquiry like this, the only safe course for a court is, to follow some great well established and leading principle, and not be led off in inquiries which, however they may seem to the superficial observer, have no real bearing or effect upon the desired result. In so vast a system, under the recent profound investigations of the civilians, all that can be required from the time and industry at our command, is to consult carefully their works, and ascertain and learn not only what is in them, but what is not in them, as well as the cause or reason of any favorite doctrine of ours not being recognized by them. Labors of this kind give greater aid in the investigation of principle than any effort that we, with our limited means of knowledge, can make in attempts to point out their errors.

No text of the Roman law has been exhibited, which authorizes any form of remuneration for the death of a person, other than that referred to in the opinion of the court in *Hubgh's* case. If any such text existed, it would have been found; the presumption then is, that no such text exists.

That the provisions in the title of the Aquilian law affecting this case and those in the titles *de his qui effunderint* and the law *de suspensis*, were not general laws, but special laws, that is, that they did not establish any general principle, cannot be questioned. They were of a police character, imposed a penalty and were of a restricted import. The actions given were called popular, and any citizen had a right to prosecute them, and it may be admitted for argument's sake, that they gave the preference to the party most interested.

The question then occurs, how were the proceedings in the *actio popularis* classed among the actions of the Roman law?

Mackelday says, that penal actions are those resulting from a delit by which a penalty—*une peine*—is sought to be recovered, which, with the Romans, con-

HERMANN
*v.*
CARROLLTON R.R.

sisted principally in the right the plaintiff had to recover the double, the triple or the quadruple of the damage, caused by the defendant.

The following collection of texts is found in the work of Brissonius de verbo. signific. lib. xiv, p. 1598.

Popularis utique actio cuilibet ex populo cui per edictum postular licet, datur : ita tamen ut is cujus interest præferatur. L. 3, § ult. D. de popular. action. et ex pluribus simul agentibus prætor eligit idonciorem. L. 2, D. eod. tit. Per se autem, non per procuratorem populares actiones exercendæ erant, mulierique ac pupillo non debantur, nisi cum ad eos res pertinebat : neque in heredes dabantur, nec supra annum extendebantur. L. 5. L. 6. L. § 1. D. eod, tit. Licet in popularibus actionibus procurator dari non possit, &c. L. 42 D. de procura tor. Hujus-modi populares actiones pœnalibus adnumerat actionibus. L. 32, D. ad leg. Falc.

As the author, Brown, quoted by the counsel on page 46 of his argument, states, in speaking of the law *De His*, " the penalty of accidental homicide was fixed at a sum, to wit, fifty aurei, because, by the Roman law, no estimate could be made of damage suffered by death," consequently, there could be no double, triple or quadruple of the damage, and the fine was fixed at a specific sum.

Where, then, is the error of the court in considering those laws to be of a police or penal character and exceptions to that general rule which denies an action to a party for the death of a freeman ?

· If the heir had the right, on general principle, to sue for damages occasioned by the death of his ancestor, where was the necessity of giving him the right to exact this penalty, or any portion of it, in those particular cases ? Does not a provision to that effect, by a special law of this character, prove that without the special law the right had no existence.

Voet, it is said, in his commentary on this title—*De His*—extends the remedy of the wife and children beyond the penalty of fifty aurei. The word *hodie* sufficiently explains the meaning of that author. Is not the proposition that, at his time, they were not limited to the penalty of fifty aurei, pregnant with the direct implication that, in his opinion, they were so limited before that period ?

What was Voet writing about ? What is the object of his work ? Let its title speak. Commentarius ad Pandectas, in quo prætor Romani juris principia ac controversias illustriores *jus etiam hodiernum* et præcipue fori questiones excutiuntur. He wrote in Holland, and the first edition of his work was published at the Hague in 1716. In his preface, he says : Ceterum sociandum censui Romanae jurisprudentæ explanationem cum *hodierni juris* tractatione, iis inductus rationibus, &c.

The summary or head note of the title makes the distinction too plain for argument.

Ad quid agatur, si homo liber dejectione lœsus vel occisus sit, *jure civili et hodierno ;* et quinam tunc agere possint ?

But supposing the opinion of Voet was as supposed, of what consequence is it ? Is not the title there and cannot the court read it ? Vide Muhlenburg, *Doctrina Pandectorum*, § 451, 452. This work contains the most correct exposition of the Pandects we have ; it is frequently quoted with approbation by Savigny.

Conceding for argument's sake, therefore, the position urged by the learned counsel to be correct, that in the event of the accidental death of a freeman from causes stated in these laws, the Roman law gave the heir or party most interested, the right to sue for and recover the penalty fixed by them ; is this an exception to the general principle, that no estimate can be made of the value of the life of a freeman, or does it overturn and extinguish it, and establish the antagonist principle that, by the Roman law, the value of the life of a freeman could be calculated ?

The court, in *Hubgh's* case, determined that the law was of a penal character, and was an exception to the general rule, which allowed no action for the death of a freeman, and this court is called upon to reverse this doctrine.

As the argument stands, it cannot be presumed that a right of action existed under the Roman law ; concerning which, one word of recognition is not found in the voluminous body of that law. If the right existed, how does it happen that no mention is made of it in those works which have treated on the subjects of rights and remedies under the Roman law.

HERMANN        It is not for every injury that an action will lie, or that a remedy is provided.
   *v.*        So said Blackstone and Pothier, and the quotation from Gibbon in the coun-
CARROLLTON R.R. sel's brief, tells us, when the obligation is ratified by law, the interested party
may compel the performance by a judicial act; but not until then.   Where is
this action recognized in the Roman law?  The remedy given by the Roman
law for accidental death from certain causes, was in the recovery of a penalty.
Is this in conflict with the general principle?  If it is an exception to it, by
what form of logic can the exception be made to override and extinguish the
principle?

The special laws under consideration presuppose, in all cases but one, a right
to recover damages, and double, treble, and quadruple them as a penalty.

In that one case of homicide, why is the penalty of fifty pieces of gold
fixed?  Because no damages were due or could be recovered, and therefore
the necessity of establishing the amount of penalty numerically.

The policy of this principle of the Roman law, which has been incorporated
in the English law and followed in the American States, is obvious.

It was necessary in order to preserve the sanctity of the family—an institu-
tion upon which the Roman civilization was based, and over which Christianity
extended its blessed protection.  The scrutiny, enquiries and calculations as to
value of human life to a wife or heir, lead to scandal, to the disturbance of the
family peace, and in most cases are impotent, absurd and utterly fruitless.
They surpass the limit which Providence has assigned to human knowledge and
action.  But a contrary system has been recently established.  Its operation,
its effect, remains to be tried.  In Louisiana the law is unchanged; she stands
to the ancient policy of Rome and of England, and to a conservative principle
which has exercised its salutary influence for nearly two thousand years.

Respecting that portion of the opinion of the court which relates to the Span-
ish law, it is hardly worth while to solicit the attention of the court at much
length.

The translation of the Partidas into English, in 1820, was published at the
expense of the State and under its patronage.  The work was executed under
a law authorizing it, by Moreau Lislet and Henry Carleton, who were, at the
time, men of high standing at the bar.  The former, as a learned civilian, was
perhaps at the head of the profession, and thoroughly versed in the jurispru-
dence of the State, having been a practitioner of law from the period of the
occupation of Louisiana by the Americans.  The latter was a well educated
and very successful lawyer, and, from his reputation at the bar, was afterwards
raised to the bench of the Supreme Court.

The laws in force in the State only were translated.  These parts which re-
late to the Catholic faith and to matters of a criminal nature having been re-
pealed.  Vide Preface.

The important part of 7 Partida, tit. 15, lex. 25, which was omitted in the
translation, was left out, because, in the opinion of those jurists, it was of a
criminal nature, and therefore repealed, and no longer in force in Louisiana.
Thus at the time when this Spanish law prevailed, we have the opinion of those
jurists of the character of this part of the law.  As no action has ever been
brought in Louisiana to recover damages for the death of a man, and no dis-
sent has ever been shown to the correctness of this omission, it is not a strained
inference by any means to suppose that the sentiment of the bar concurred
in it.

The court examined this omitted part, and considered it as providing a pun-
ishment for homicide, and not affecting at all any general principle of civil right.

The 5th Partida, in most of its laws, is copied from the Roman law.  The
rule that a freeman's life was beyond all price and could not be estimated, was
a principle of Spanish as well as of the Roman law, as appears from an exami-
nation of the text, Partida 5th, tit. 9, lex. 3, which treats of contribution in
cases of jettison, says: "And if any of the merchants should have slaves on
board, he will be obliged to appraise them, and pay for each of them, in the
same manner as for other things that remained in the vessel.  But if there be
freemen on board, who brought nothing but their persons, whatever may be
their number, they will not be obliged to contribute for what was thrown over-
board; for a freeman neither can or ought to be valued like other things."

Gregorio Lopez in his commentary on this principle, refers, among other texts
of the Roman law, to the very title under discussion, *de his qui effunderint.*

The Institutes of the law of Spain, by Asso y del Rio and Manuel, is a work of great thoroughness and exactness, so much so, that by a law of the Novis-sima Recopolicion, daily lectures, of an hour and a half for the space of two years, on these Institutes, are directed to be given by the professors of law in the Universities of Spain.

In this work, the acts for which a reparation can be sought by law, are described with great minuteness and particularity, as well as the remedies to be exercised by and against heirs. No allusion is there found to any such right as that pretended by the plaintiff. The book is as silent as the Roman law, as to any such action. Vide page 158 of translation, book 2, tit. 19.

A comparison of the Spanish and Roman jurisprudence will result in the conviction that there is no material difference between them in relation to this subject.

The undersigned therefore submit that the opinion of the court in *Hubgh's* case is correct, so far as it decides that by the Spanish and Roman law, no civil action for the recovery of damages for the death of a free person, can be maintained.

A few observations will be added concerning the Article 2294 of the Code.

One of the main purposes and objects of the Code Napoleon was to establish an uniform system of law throughout France, in which discrepant usages, laws and customs prevailed according to the different origin of the communities of which that empire was composed. The formation of our Codes was not for that object, and it is not at all strange that similar articles should receive a different interpretation and application in the two countries. But it would be strange, indeed, if an interpretation of similar articles in the two Codes by the Court of Cassation, were to be forced upon us in direct contradiction to the interpretation given to the articles by our own courts. Within the last seven years the interpretation given to the Article 2294 by the court in *Hubgh's* case, has been acted upon, it is believed, without exception. It has been declared from the bench to be the settled law, at least twenty times during the administration of the Supreme Court of 1846.

The decisions on the Code Napoleon, referred to in 13 Locré, were all examined in *Hubgh's* case. The discourse of Mr. Tarrible did not escape attention. The court will find it of little aid in the decision of the subject under consideration. His notion proves too much; it goes too far; it conflicts with the acknowledged theory of the law of legal actions.

Would a sneer, which should annihilate the matrimonial prospects of a damsel or widow, be actionable? Could a suit in damages be brought for a significant shrug of the shoulders of a capitalist, with the accompanying manifestation of distrust, by a young shop keeper, whose bills were refused in consequence of it? Would an action for damages be maintainable for a man's refusal to do business or trade with another? No, there is a law of actions, and our system of jurisprudence has not lost all claims to a reasonable science. This part of the case is so fully treated in the opinion in *Hubgh's* case, that nothing further is deemed necessary to be stated in relation to it.

The undersigned therefore conclude that the rule in *Hubgh's* case must stand, because:

1st. It has been deliberately decided, after full argument and consideration, by the court in the last resort.

2d. Because it is a correct exposition of the law, and nothing has been urged which would authorize its reversal.

MERRICK, C. J. This suit was instituted by the plaintiff, the widow of *Dr. Joseph Ursin Landreaux*, deceased, and tutrix to his four minor children, to recover damages for the negligent and careless conduct of the agents of the defendant, in running their railroad cars, by means of which *Dr. Landreaux* was killed, and his widow and children deprived of all means of support.

The verdict of the jury and judgment of the lower court were in favor of the plaintiff, awarding her twenty thousand dollars' damages. The defendant has appealed.

This case therefore presents for our reconsideration the question decided by our predecessors in the case of *Elizabeth Hubgh* v. *The New Orleans and Car-*

*rollton Railroad Company*, (6th An., 495,) whether Article 2294 of the Civil Code gives any remedy for the loss of the life of a free person against the person occasioning such loss of life.

The question has been discussed with great ability and research by the counsel who have argued this case, both on the part of the plaintiff and defendant. The authorities on which the decision in the case of *Hubgh* was based, have been subjected to the severest tests of examination and criticism, and were the question *res nova*, we should feel great difficulty in arriving at a satisfactory conclusion.

Our predecessors, however, have held that this Article of the Civil Code was not introductory of a new rule, but merely the enunciation of a principle well known and often acted upon under the jurisprudence of the country, prior to the introduction of the Civil Code.

They have also held, that under the former jurisprudence of the country, no action like the present was given the surviving wife and children.

Whatever difficulties the learned argument of plaintiff's counsel may have created in our minds, we do not think in a matter merely doubtful we are called upon to overrule, or are justified in disregarding a decision of our predecessors, pronounced after a full consideration of the subject, and by men who, from their long experience and great learning and acquirements, must not only have been thoroughly acquainted with the jurisprudence of the country, but also with the general sentiment of the profession upon a subject which must have occasionally engaged the attention of almost every practitioner.

Whether the recent Act of the Legislature approved March 15th, 1855, (Sess. Acts 1855, p. 271,) has changed the law in this respect, we do not consider it necessary to decide. The statute having been passed since the acts complained of, cannot have any effect upon this case.

The difficulty in assessing damages in a case like the present, is not without its weight upon our minds. Had the jury returned a verdict for $50,000 instead of $20,000, it would have been difficult to say that the verdict was excessive, in view of the age, standing and profitable practice of *Dr. Landreaux;* yet, with all these circumstances in his favor, no man could take upon himself to say, that he would have lived any given period, or that had he remained at home on the 11th of September, 1852, or had travelled by some other conveyance or in some other direction, he would have survived a week or a day longer. At most, the assessment of damages in a case like this, is but the balancing of probabilities and chances.

If the Legislature has intended or shall hereafter introduce a new rule on this subject, it is to be hoped it will provide the criterion by which such damages are to be estimated, and limit the extent to which they may be allowed.

We have not deemed it important to introduce into this opinion the texts of the Roman and Spanish law relied on by defendant, nor the citations from the civilians pressed upon our attention by the plaintiff's counsel. It is sufficient to repeat in conclusion, that we have not been convinced that the construction of Article 2294 C. C., by our predecessors, is erroneous, and we therefore consider it our duty to follow their decision.

It is therefore ordered, adjudged and decreed by the court, that the judgment of the lower court be avoided and reversed, and that there be judgment against the plaintiff and in favor of the defendant, and that the plaintiff pay the costs of both courts.

Re-hearing refused.